UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

| | |
|---|---|
| **JWMORENTZ LLC**<br>**5021 Del Ray Avenue**<br>**Bethesda, Maryland 20814,**<br><br>                                    **Plaintiff,**<br><br>        v.<br><br>**DEFENSE INDUSTRIAL BASE INFORMATION**<br>**SHARING ANALYSIS CENTER, INC.,**<br>**Serve: The Company Corporation, registered agent**<br>**251 Little Falls Drive**<br>**Wilmington, Delaware 19808,**<br><br>                                    **Defendant.** | Case No. _____ |

## COMPLAINT

COMES NOW Plaintiff JWMorentz LLC ("JWM"), by and through undersigned counsel, and for its Complaint against Defendant Defense Industrial Base Information Sharing Analysis Center, Inc. ("DIB ISAC") states as follows:

### JURISDICTION AND VENUE

1.      Plaintiff JWM is a limited liability company organized under the laws of the State of Delaware and authorized to transact business in Maryland.

2.      JWM's members are both citizens of the State of Maryland.

3.      Defendant DIB ISAC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of Alabama.

4.      This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332 as this is a dispute between citizens of different states and the matter in controversy exceeds $75,000.00.

5.     This Court has personal jurisdiction over DIB ISAC because this action concerns a contract that was negotiated and performed, in part, in the State of Maryland and because the contract established a continuing series of obligations between DIB ISAC and a citizen of Maryland.

6.     Venue properly lies in the State of Maryland.

## THE PARTIES AND THEIR PRINCIPALS

7.     Dr. James Morentz ("Morentz"), the sole owner of JWM, has spent over 25 years developing technology solutions for planning and emergency response for Fortune 50 companies, small businesses, international governments and organizations as well as U.S. local, state, and federal agencies.

8.     Morentz has received a Computerworld Smithsonian Award for "Visionary Use of Information Technology," a Chamber of Commerce Blue Chip Enterprise Initiative Award, and the Federal Emergency Management Agency's Individual and Community Preparedness Award for Technology Innovation.

9.     Morentz created software known as SpotOnResponse; a trusted crowd-sourcing and location-based situational awareness application built to keep communities and organizations safe through secure channels of communication.

10.    In early 2016, Morentz learned that the National Institute for Hometown Security ("NIHS") would be requesting proposals for bids in connection with the Department of Homeland Security's Infrastructure Protection Program.

11.    After acting as President or CEO of small technology companies for more than 25 years, Morentz joined SAIC, a science and engineering firm providing government services and

information technology support, as Corporate Vice President, because of his many connections in the information technology support field.

12. Steve Lines ("Lines") was one of the many connections Morentz made during his tenure at SAIC. By 2015, Lines was the Executive Director of DIB ISAC.

13. Information Sharing and Analytics Centers, or "ISACs," are sector-based centers that collaborate with each other via the National Council of ISACs. ISACs collect, analyze and disseminate actionable threat information to their members and provide members with tools to mitigate risks and enhance resiliency.

14. DIB ISAC was created to provide analyst or security officers a multi-sector view of emerging threats that may extend beyond the analyst's respective organizational domain. DIB ISAC uses a regional outreach to ensure that member companies receive actionable threat intelligence in responding to and recovery from manmade and natural disasters.

**FACTUAL ALLEGATIONS**

*The Teaming Agreement*

15. On March 31, 2016, Morentz e-mailed Lines and DIB ISAC's Director of Emergency Services and Training, Chad Tillman ("Tillman"). In that e-mail, Morentz proposed a teaming agreement (the "Teaming Agreement") between JWM and DIB ISAC that would allow DIB ISAC to submit a proposal to NIHS that, among other things, would entail customizing SpotOnResponse for use by DIB ISAC's members. A copy of this email is attached as <u>Exhibit 1</u> and its terms are incorporated herein.

16. As reflected in Exhibit 1, JWM's proposed Teaming Agreement allowed DIB ISAC to obtain a contract with NIHS without having to: (1) actually draft a proposal; or (2) do

much in the way of actual work on any resulting contract.  Consequently, the Teaming Agreement logically required that JWM receive most of the revenue in the event DIB ISAC was awarded the contract.

17.     Under the Teaming Agreement, JWM was responsible for drafting the proposal that would be submitted to NIHS.  In the event NIHS awarded a contract to DIB ISAC, JWM would also be responsible for performing that contract.  Given the minimal amount DIB ISAC was expected to contribute to the effort, the Teaming Agreement called for DIB ISAC to receive just ten percent of the revenues from any contract with NIHS.

18.     On April 5, 2016, DIB ISAC accepted the Teaming Agreement by transmitting an e-mail stating: "We agree."

### *The Proposal to NIHS*

19.     The deadline for proposal submissions was April 8, 2016.

20.     In accordance with the terms of the Teaming Agreement, JWM prepared a proposal to NIHS and circulated a draft to Lines and Tillman via e-mail on April 5, 2016.

21.     Lines and Tillman approved the draft proposal for submission.  Consequently, Morentz submitted the *Defense Industrial Base Human Resource Resiliency Through Two-Way, Location-Based Information Sharing* proposal on April 6, 2016 (the "Proposal"), registering to submit on behalf of DIB ISAC.  A true and correct copy of the Proposal is attached as Exhibit 2 and its terms are incorporated herein.

22.     The Proposal identifies Lines as being the "Principal Investigator" and describes the project's objective as, among other things, "improv[ing] Defense Industrial Base (DIB) human resource security and resiliency by employing proven, state-of-the-art information

exchange and mobile location-based technologies that protect employees through awareness of threats and incidents as well as speed their return to work following events to assure minimal disruption of delivery of DIB products and services..." (the "Project").

23. The technologies to be utilized throughout the Project were specified in the Proposal as the XchangeCore Web Service Data Orchestration and the SpotOnResponse mobile application (collectively, the "Technologies").

24. The Project was premised on the concept that the Technologies would consume automated incident and threat source data plus manually entered data from the DIB ISAC Watch Center. The Technologies would then provide the resulting data to subscribing DIB ISAC member companies' situational awareness software. The Technologies were owned by SpotOnResponse and operated by the SpotOnResponse technical staff in a "Cloud" computing environment developed and maintained and paid for by SpotOnResponse. The DIB ISAC, as an administrator of the software, would manage user enrollment and other aspects of the software distribution to member DIB companies' operations centers and DIB company employees.

25. Among other things, the Project required DIB ISAC to gather user feedback information and share it with JWM. This would allow the Technologies to be further refined and improved.

26. Critically, the pricing stated in the Proposal made clear that DIB ISAC was to retain just $45,000.00 out of the total amount of $306,152.00 that was to be billed to NIHS; $6,152 was for expenses; the remainder of the contract amount was to be paid to JWM.

*The Subcontract Agreement*

27. NIHS, as prime contractor, accepted the Proposal and entered into a Subcontract Agreement with DIB ISAC, as subcontractor, with an effective date of September 22, 2016 (the "Subcontract Agreement"). A true and correct copy of the Subcontract Agreement is attached hereto as Exhibit 3 and its terms are incorporated herein.

28. Pursuant to Paragraph 3, the Subcontract Agreement was to remain in full force and effect for a period of 18 months (the "Term").

29. Paragraph 4 of the Subcontract Agreement requires NIHS to pay DIB ISAC "for the completion, to NIHS's reasonable satisfaction, of each Payment Milestone." The Subcontract Agreement contains a total of seven such Payment Milestones.

30. Invoices for all payments were to be submitted to NIHS by DIB ISAC within 30 days of completion of each Payment Milestone.

31. Upon receipt of an invoice, NIHS was to verify completion of the Payment Milestone and make payment to DIB ISAC when "reasonably satisfied" the Payment Milestone and performance requirements had been met.

*JWM's Performance of the Subcontract Agreement*

32. Throughout this time, JWM performed its work in Maryland. JWM directly performed tasks and directed others to perform tasks. The delivery mechanism for all products was via email submission from Maryland and software programming tasks were delivered over the Internet. JWM's efforts to perform the Subcontract Agreement on behalf of DIB ISAC required JWM to be in regular contact with DIB ISAC by telephone and e-mail.

33.     During the Subcontract Agreement negotiations, JWM developed deliverables for Milestone 1 and substantially completed and submitted to DIB ISAC the financial plan and budget which was subsequently included in the Subcontract Agreement. On or about September 23, 2016, JWM and DIB ISAC completed the Milestone 1 requirements.

34.     On or about September 23, 2016, DIB ISAC submitted certain deliverables, including a Subcontractor Certification of Milestone Payment Achievement, and invoice to NIHS in the amount of $30,000 for completion of Milestone 1.

35.     NIHS paid the Milestone 1 invoice on or about October 10, 2016.

36.     In accordance with the Teaming Agreement, on or about October 12, 2016, JWM invoiced DIB ISAC for $15,000.00, its portion of the Milestone 1 Payment.

37.     In accordance with the Teaming Agreement, within ten days of receiving the Milestone 1 payment, DIB ISAC paid JWM the amount of $15,000.00.

38.     Thereafter, JWM undertook efforts to fulfill the Milestone 2 requirements, including installing the Technologies which were then accessed by the DIB ISAC Watch Center.

39.     Throughout this time, JWM worked closely with Tillman at DIB ISAC, as he was responsible for recommending improvements to the SpotOnResponse user interface at the DIB ISAC Watch Center. It was Tillman's job to gather user feedback and share it with JWM for use in the next version of the SpotOnResponse app.

40.     On or about December 9, 2016, JWM and DIB ISAC completed the Milestone 2 requirements.

41. On or about December 12, 2016, DIB ISAC submitted certain deliverables, including a Subcontractor Certification of Milestone Payment Achievement, and invoice to NIHS in the amount of $25,000 for completion of Milestone 2.

42. As a courtesy to another small business, JWM delayed submitting its invoice until after DIB ISAC had been paid. For approximately ten days thereafter, Lines failed to comply with NIHS requirements to upload deliverable documents. Following that, there were problems with NIHS's ability to directly deposit funds into DIB ISAC's account. On January 14th, Lines reported to JWM that "We finally received the NIHS check." NIHS had paid the Milestone 2 invoice.

43. Upon hearing that DIB ISAC had received payment and now had sufficient funds to pay JWM, JWM replied to Lines "I'll get you my Milestone 2 invoice now that you will have the money soon." In accordance with the Teaming Agreement, on or about January 16, 2017, JWM invoiced DIB ISAC for its portion of the Milestone 2 Payment with a payment due date of January 30, 2017.

44. DIB ISAC failed to timely pay to JWM its portion of the Milestone 2 Payment.

45. On or about February 6, 2017, JWM made demand upon DIB ISAC for its portion of the Milestone 2 payment. Demand was made again on February 20, 2017.

46. DIB ISAC failed to make the Milestone 2 payment to JWM. In an email dated February 27, 2017, Lines indicated to Morentz that DIB ISAC used those funds to "pay other bills." A true and correct copy of that email is attached hereto as Exhibit 4.

47.     Consequently, JWM was forced to cover its own costs of development and hosting costs for the Technologies associated with Milestone 2.  JWM demanded payment again on March 2, 2017.

48.     Nevertheless, JWM continued developing the next version of SpotOnResponse (Version 2) in accordance with the Milestone 3 requirements and delivered it to DIB ISAC on February 20, 2017.

49.     On March 2, 2017, JWM sent an email and invoice to Lines for $52,000, representing the Milestone 3 Payment.  A true and correct copy of the email and invoice are attached hereto as Exhibit 5.

50.     An email exchange followed, with Lines claiming DIB ISAC did not owe JWM $52,000, but rather, $20,000 out of the Milestone 3 Payment.  A true and correct copy of the email exchange is attached hereto as Exhibit 6.

51.     Not long thereafter, DIB ISAC undertook to wrongfully squeeze JWM out of the Project so that DIB ISAC could attempt to evade its responsibility for honoring its obligation to pay JWM 90% of the revenues of the Project.

52.     To that end, DIB ISAC falsely manufactured a series of complaints regarding JWM's performance.  DIB ISAC, however, did not allow its disingenuous complaints regarding JWM's work to prevent DIB ISAC from continuing to utilize the fruits of JWM's labor and, moreover, from continuing to bill, and collect from, NIHS.

53.     The coup de grace was delivered on June 15, 2017 when DIB ISAC's counsel sent a letter to JWM purportedly terminating the Teaming Agreement and falsely claiming that

SpotOnResponse was not a "marketable product."  A true and correct copy of this letter is attached hereto as <u>Exhibit 7</u>.

### *Count for Breach of Contract*

54. The allegations set forth above are restated and incorporated herein by reference.

55. The Teaming Agreement is a valid and enforceable contract between JWM and DIB ISAC.

56. DIB ISAC breached the terms of the Teaming Agreement by failing to pay JWM according to its terms.

57. Additionally, DIB ISAC breached the implied covenant of good faith and fair dealing when it terminated the Teaming Agreement without proper cause.

58. DIB ISAC's breach of the Teaming Agreement is without justification or excuse.

59. As a result of DIB ISAC's breach of the Teaming Agreement, JWM has suffered damages of not less than $265,000.00.

**WHEREFORE**, JWM prays that this Court:

(a) enter judgment in favor of JWM and against DIB ISAC in an amount not less than $265,000.00; and

(b) award any such further relief as this Court may deem just and proper.

Respectfully submitted,

By: <u>*/s/ Thomas F. Murphy*</u>
Thomas F. Murphy, Esq.
Lindsay A. Thompson, Esq.
Friedlander Misler, PLLC
5335 Wisconsin Avenue, NW, Suite 600
Washington, DC  20015
Phone:  (202) 872-0800; Fax: (202) 857-8343
*tmurphy@dclawfirm.com*
*lathompson@dclawfirm.com*
*Counsel for Plaintiff*